**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | |
|---|---|
| JERRI JOETTE TILLETT, | CV-15-48-BLG-SPW-CSO and CV-15-61-BLG-SPW-CSO |
| Plaintiff, | |
| vs. | **FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| BUREAU OF LAND MANAGEMENT, INTERIOR BOARD OF LAND APPEALS, and DEPARTMENT OF INTERIOR, | |
| Defendants. | |

## I.    <u>Introduction</u>

Plaintiff Jerri Joette Tillett ("Tillett"), proceeding *pro se*, brought the two actions listed above against Defendants Bureau of Land Management, Interior Board of Land Appeals, and U.S. Department of Interior (collectively "BLM"), challenging BLM's management of wild horses on the Pryor Mountain Wild Horse Range ("PMWHR").

In CV 15-48-BLG, Tillett challenges BLM's fertility control program ("fertility control case"), and in CV 15-61-BLG she challenges BLM's gather program ("gather case"). BLM uses both programs to manage the wild horse population on the PMWHR under its authority under Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340 (1971) ("the Wild Horses Act"). On August 26, 2015, with the parties' agreement, the Court consolidated the two cases, designating CV 15-48-BLG the lead action for purposes of filing in the cases. *Order Consolidating Cases and Setting Case Management Plan (ECF No. 16).*[1]

Now pending is BLM's summary judgment motion addressed to both cases. *BLM's Combined Mtn. for Summary Judgment on Consolidated Cases (ECF No. 25).* The administrative records for both cases have been filed with the Court.[2] Having reviewed the parties' arguments and submissions together with the administrative records, the Court recommends that BLM's motion be granted.

---

[1]"ECF No." refers to the document as numbered in the Court's Electronic Case Files. *See The Bluebook, A Uniform System of Citation, § 10.8.3.* Any references to page numbers are to those assigned by the electronic filing system.

[2]The Court cites herein to the administrative record in the fertility control case as "FAR" and to the administrative record in the gather case as "GAR."

## II.    Background

### A.    The PMWHR

As this Court has noted in other cases,[3] Congress declared in 1971 that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West, and that they enrich the lives of the American people.  The Ninth Circuit Court of Appeals, too, has noted Congress' recognition of wild horses' value to our nation's heritage and its efforts to preserve them.  *See In Defense of Animals v. U.S. Dept. of the Interior*, 751 F.3d 1054, 1058 (9th Cir. 2014).  But the court has also noted the challenges inherent in managing wild horses and the areas they occupy.  As the Ninth Circuit observed recently:

> Wild horses – mustangs – and burros are part of our nation's heritage from the American West; a heritage Congress has sought to preserve. That these animals should roam the Western spaces appeals to the nature lover and historian in each of us.
>      But these animals eat and trample.  Even in the wide open West of our nation, there is just so much forage; there are also many vulnerable cultural artifacts underfoot.
>      These animals also multiply.  And when too many of them abound in limited land, the congressionally-appointed

---

[3]*See Friends of Animals v. BLM, et al.*, CV 15-59-BLG-SPW (*ECF No. 18 at 2-4*); *Tillett v. BLM, et al.*, CV 14-73-BLG-SPW (*ECF No. 35 at 2-5*); *Tillett, et al. v. BLM*, CV 12-87-BLG-RFC (*ECF No. 21*); *Cloud Foundation, Inc. v. Kempthorne*, 2008 WL 1794741 (D. Mont., July 16, 2008).

stewards of that land must act to protect the environment.
*Id.*

The Secretary of the Interior established the PMWHR to provide a home for free roaming horses. It spreads over more than 38,000 acres in Carbon County, Montana, and Bighorn County, Wyoming. "The PMWHR is an extremely diverse and complex area topographically, geologically, and ecologically. Environment and elevation in the PMWHR vary from a sagebrush/salt-shrub dominated desert at 3,850 feet at the southern end of the range in Wyoming to subalpine habitat at 8,750 feet in Montana at the high point of the range. The PMWHR was established to protect a population of wild horses of Spanish ancestry, wildlife, watershed and recreational, archeological, and scenic values." *Cloud Foundation, Inc. v. Kempthorne*, 2008 WL 2794741, *3 (D. Mont., July 16, 2008) (citations omitted).

BLM has management responsibilities for the PMWHR. Management of a wild horse range requires maintaining a horse population that will ensure a thriving ecological balance attained by keeping the horse herd at an appropriate management level ("AML"). 16 U.S.C. § 1333(b)(1). As part of its management obligations, in 1984

BLM issued a herd management area plan ("HMAP") establishing an AML at 121 horses.

In 1992, BLM modified the 1984 HMAP and established an AML at 85 to 105 horses. The 1992 HMAP governed horse management in the PMWHR until 2009. Between 1992 and 2009, the PMWHR averaged a population of approximately 156 horses.

## B.    The 2009 Herd Management Area Plan ("2009 HMAP")

In 2008, BLM evaluated the range to determine if the 1992 HMAP management objectives were being met. 170 horses were found. The evaluation found that, at that number of horses, certain areas of range were overused due to grazing and drought. The evaluation also determined, however, that the PMWHR could accommodate more horses than the prior AML. BLM ultimately determined in its PMWHR/Territory EA [environmental assessment] and HMAP ("2009 HMAP") that an increase in the AML to 90 to 120 horses was warranted.

The 2009 HMAP stated: "The population will not be taken to the low range of the Appropriate Management Level (AML) when fertility control is utilized." *FAR 17; GAR 18.* The 2009 HMAP found "The

population would be managed using a combination of population control techniques including gathers, fertility control, natural means or a combination of prescriptions" to maintain the AML. *FAR 682-83; GAR 2749-50*.

The 2009 HMAP also: (1) provided for continued detailed monitoring of horses, range, and genetics to determine the AML's impact as it related to achieving and maintaining a thriving natural ecological balance on the public lands and maintaining Spanish phenotype characteristics, genetics, bloodlines, age classes, and band structure, *FAR 654-55; GAR 2721-22*; (2) included selective removal considerations when a gather is used to ensure the Spanish phenotype and less common horse genetics are retained, *FAR 690-91; GAR 2757-58*; (3) required compliance monitoring to continue after its adoption, to include a required monitoring log to track habitat monitoring, population monitoring, and project implementations to assist the public and BLM to track implementation and to help determine when adjustments may be needed, *FAR 655; GAR 2722*; (4) provided that implementation is necessary to work towards the established AML, to ensure wild horse health, to limit wild horses to the PMWHR

boundaries, and to protect the range from deterioration linked to overpopulation, *FAR 658; GAR 2725*; and (5) noted the downward trend in the PMWHR's ecological condition in low elevation areas likely caused by an excess of wild horses during drought years beyond the habitat's capacity, prompting the AML of 90 to 120 horses to help promote a thriving natural ecological balance thus maintaining or increasing vegetation density, vigor, reproduction, productivity, diversity, and forage availability, *FAR 724; GAR 2791*.

The 2009 HMAP determination of the AML at 90 to 120 horses, not including foals, was challenged and upheld in the U.S. District Court for the District of Columbia in *Cloud Foundation, Inc., et al. v. Ken Salazar, et al.*, 999 F.Supp.2d 117, 121 (D. D.C. 2013), *appeal dismissed sub nom., Cloud Foundation v. Jewell*, 2015 WL 1606931 (D.C. Cir., Mar. 16, 2015).

### C. 2015 Fertility Control EA and Decision Record and 2015 Gather EA and Decision Record

As noted above, in early 2015, the horse population was 170 horses. *FAR 48; GAR 62*. The 170 horses exceeded the 2009 HMAP's AML of 90 to 120 horses (excluding foals). BLM thus sought to analyze the need to take action to bring the PMWHR horse population closer to

the approved AML of 90 to 120 horses to protect the range from deterioration and to achieve the ecological balance addressed in the 2009 HMAP.  *FAR 4; GAR 17.*

BLM issued two separate EAs.  One EA analyzed the use of fertility control to maintain the horse population within the AML and to reduce the need for gather and removal operations.  *FAR 20.*  The other EA analyzed the use of a gather to help reach the AML and to prevent degradation of the PMWHR.  *GAR 17.*

Both EAs tier to and rely on the analysis set forth in the 2009 HMAP.  *FAR 17; GAR 16.*  And both EAs proposed action designed to prevent rangelands deterioration and help maintain a thriving natural ecological balance and multiple-use relationships, as described in the 2009 HMAP.  *FAR 18; GAR 18.*

### 1.    Fertility Control

On March 18, 2015, after considering public comments, BLM notified interested parties that it was issuing a Finding of No Significant Impact ("FONSI") and Decision Record ("DR") for the PMWHR fertility control EA, DOI-BLM-0010-2015-006-EA ("Fertility Control DR").  *See FAR 1-48.*  The notice provided that the Fertility

Control DR is tiered to the PMWHR/Territory EA (MT-010-08-24) and 2009 HMAP. *FAR 1, 3, 10, 646-807*.

The 2015 Fertility Control DR modified the fertility control protocols to provide for administration of the fertility control vaccine during any season. It also modified which horses would receive the fertility control vaccine in efforts aimed at achieving a balance between births and deaths such that, if successful, the need for removing horses through gathers would be reduced. *FAR 25-28*.

### 2. <u>Gathers</u>

On June 16, 2015, after considering public comments, BLM notified interested parties that it had issued a FONSI and DR for the PMWHR Bait/Water Trapping Gather Environmental Assessment DOI-BLM-0010-2015-0018-EA ("Gather DR"). It reflects that BLM considered prior gather and monitoring results and reaffirmed the continued application of the 2009 HMAP AML of 90 to 120 horses. *GAR 9, 17, 33-35*. It further confirmed that the population level of 170 horses was too high and that the established AML of a high of 120 horses was more appropriate over the long term. *GAR 34*.

BLM considered three alternative plans: (1) a "no action" plan

under which it would conduct only fertility control but take no other action; (2) its proposed action of gathering 25 horses in addition to fertility control; and (3) "Alternative A," introduced based on public comments proposing smaller, incremental gathers. *GAR 23-25*. After considering public comments and the EA's analysis, BLM decided to implement Alternative A. Under that action, BLM would gather 15 to 20 horses in the summer of 2015, and monitor the effects of fertility control and other management activities in determining the need for future gathers. *GAR 32*.

In implementing Alternative A, BLM would take into consideration the Spanish Phenotype and detailed information of horse relationships obtained through monitoring and as provided by the Pryor Mountain Wild Mustang Center, The Cloud Foundation, and others set forth in the Gather DR. *GAR 27-29*. BLM seeks to remove only horses with well represented genetics and at ages that make adoption viable. *GAR 23-25, 31-31*.

The Gather DR also analyzed the relationship between removal of horses and the implementation of fertility control. It found that fertility control has a minimum of a one-year lapse time until

population results are realized. After administration of fertility control, 15 to 18 foals were expected to be born in 2015 in addition to the 170 horses on the PMWHR. *GAR 22*. Because of the fertility control lapse, another 15 to 18 foals are expected to be born in 2016. Thus, the outcomes of the 2015 Fertility Control DR could not be expected to be realized until 2017 at the earliest, such that by 2017, the PMWHR population could be 194 horses. *Id*. BLM found that a herd of 194 horses could not be sustained within the PMWHR and, even if a large die-off of older animals were to occur and fertility control were applied, the population level over the next several years would not be sustainable. *Id*.

Thus, BLM decided to adopt Alternative A as action needed to achieve a thriving natural ecological balance between wild horse populations, wildlife, vegetation, water, and other multiple uses. *GAR 10-11*. BLM decided to conduct a smaller, non-helicopter bait and trap removal of horses in 2015 of 15 to 20 horses, and to allow removals in future years if the fertility control does not slow the population growth.

On June 8, 2015, Tillett filed the fertility control case, CV 15-48-BLG. On July 6, 2015, Tillett filed the gather case, CV 15-61-BLG.

## III.  Parties' Arguments

BLM argues entitlement to summary judgment in both cases for two principal reasons.  *BLM's Amended Br. in Support of Summary Judgment Mtn. (ECF No. 29) at 3-5, 12-17.*  First, BLM argues that Tillett has not alleged any specific basis for the Court's jurisdiction in either case.  *Id. at 3.*  Rather, BLM argues, Tillett inadequately asserts the following as a jurisdictional basis in both cases:

> "Ongoing systemic malfeasance that is routinely utilized by the Defendants with impunity.  This is the lack of accountability issue."[4]

*Id.* (*quoting CV 15-48-BLG, ECF No. 1; CV 15-61-BLG, ECF No. 1*).

BLM notes that Tillett's claims for relief in both cases seek: (1) a stay/halt of all BLM actions in the PMWHR; (2) an investigation of BLM's methodology; and (3) $500,000 in restitution payable to Tillett, tax-free.  *Id. at 3-4* (*citing CV 15-48-BLG, ECF No. 1; CV 15-61-BLG, ECF No. 1*).  BLM further notes that Tillett filed "legal briefs" with each case's Complaint in which she seeks to have the Court order an investigation of alleged malfeasant behavior and payment of restitution

---

[4]Throughout her filings, Tillett uses abundant emphasis in her text, including boldface, italics, underlining, all capital letters, brackets, parenthesis, and combinations of two or more of these.  When the Court quotes from Tillett's filings herein, it omits such emphasis.

to Tillett of $500,000, tax free. *Id. at 4* (citing *CV 15-48-BLG, ECF No. 2 at 3-5; CV 15-61-BLG, ECF No. 2 at 12-14*).

Neither document, BLM argues, provides any jurisdictional statute or references a statute waiving BLM's sovereign immunity that would allow the Court to order an investigation or a payment to Tillett. *Id.* Thus, BLM argues, the Court should deny Tillett's claims for an investigation and restitution or money damages and should grant judgment in BLM's favor. *Id.*

BLM also notes that, although Tillett did not allege the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, as a basis for the Court's jurisdiction over these cases, BLM argues that the APA appears to be the only applicable waiver of BLM's sovereign immunity for some of Tillett's allegations. *Id. at 5.* But, BLM argues, even the APA does not authorize the Court to order an investigation of BLM. Thus, BLM argues, the Court should deny Tillett's request for an investigation and for money damages. *Id.*

Second, BLM argues, even assuming the APA provides a jurisdictional basis for Tillett's cases against BLM, the Court nevertheless should grant BLM summary judgment. *Id. at 12-17.*

BLM argues that the Court should uphold the 2015 Fertility Control DR and Gather DR. *Id*. BLM argues that there exist no genuine issues of material fact and that it is entitled to summary judgment as a matter of law because its actions respecting the PMWHR challenged in Tillett's cases were neither arbitrary, capricious, an abuse of discretion, nor otherwise contrary to the law. *Id*.

Tillett first responds that the Court has jurisdiction. *Tillett's Resp. Br. (ECF 37) at 1*. She argues that she has alleged malfeasance and corruption by BLM and that the Court has jurisdiction over all issues of malfeasance and corruption. *Id*. Tillett further argues that this Court's jurisdiction is also rooted in her First Amendment right to petition the government for a redress of grievances and her Fifth Amendment right to due process. *Id*. She argues that all parties' "evasion of review" of Constitutional issues amounts to additional violations of her Fifth Amendment right to due process. *Id*. And, she argues that BLM "routinely violate[s] the Constitution of the United States[.]" *Id*.

Second, Tillett claims that BLM violated her First Amendment rights when it "illegally darted the nine mares over a span of years &

with multiple warnings of the illegality of it all – i.e., not a mistake as [BLM] claim[s] – it's general policy." *Id. at 2.* Tillett further claims that BLM violated her Fifth Amendment right to due process when it "failed to follow proper procedures, the law, & [its] own rules & regulations[,]" and because it is "utilizing an evasion of review of Constitutional issues – basically a series of cover-ups to suppress these facts." *Id.*

Third, Tillett argues that BLM's actions respecting the PMWHR were "arbitrary and capricious" under the APA because: (1) BLM committed perjury, which amounted to both a clear error in judgment and arbitrary and capricious behavior; (2) BLM engaged in malfeasance and corruption, including: (a) withholding evidence; (b) fraud; ©) "cook'n-the-books"; (d) "tampering with evidence/data after the fact"; (e) routine violations of the Constitution, including evasions of review of Constitutional issues – i.e., cover-ups; (f) violating BLM's own rules and regulations; and (g) lying to this Court; and (3) BLM has engaged in "felonious behavior patterns that [Tillett has] been tracking and presenting to all and sundry for years." *Id. at 3.* Tillett argues that she thinks "it's time this Court quits defending and protecting the

malfeasant status quo and starts defending and protecting the Constitution – its mandate." *Id.*

Fourth, Tillett argues that BLM has not been in compliance with the Wild Horse Act "for decades[ ]" and has "systematically & actively violated this Act, with impunity." *Id. at 4.*

Fifth, Tillett argues that BLM scientists have concluded that the best way to maintain variation in genetics of the herd is to increase current population size rather than decrease it. *Id.* She also argues that she believes that the PMWHR is in good condition and that the horses are not the principal cause of variability in vegetation dynamics but rather fluctuation in precipitation has been, a fact the BLM "has known . . . for the past two decades, and has ignored this important scientific fact – more lying & cook'n-the-books by [BLM] in order to push [its] agenda [to] zero out the wild horses on the PMWHR . . . in their own sanctuary." *Id. at 4-5.*

Sixth, Tillett argues that BLM's "ongoing illegal darting of the mares with total foreknowledge & warnings" was not a mistake as BLM claims, but rather was its general policy. *Id. at 5.* She argues that this illegal darting amounts to arbitrary and capricious behavior and

violates the First and Fifth Amendments to the Constitution.  *Id.*

Seventh, Tillett argues "reasonable doubt exists as to the validity of the data sets admitted in the Administrative Record in support of the illegal & unnecessary 2015 Gather."  *Id.*  She further argues that "the data sets were proved to be purely BLM subjective and unscientific at best."  *Id.*

Finally, in her "Disputed Facts Brief" filed with her response brief, Tillett modifies that portion of her request for relief in which she seeks restitution.  First, she amends her request for restitution by adding to the amount she originally claimed in her Complaints. Second, she amends her request to add some conditions, including her offer to hold any restitution award "in abeyance" until the investigation she requests is complete.  *ECF No. 38 at 8-10.*

In reply, BLM argues that: (1) Tillett failed in her response brief to provide any authority for her claimed entitlement to money damages or restitution, *BLM's Reply Br. (ECF No. 39) at 1*; (2) Tillett failed to assert a jurisdictional basis for the Court to order an investigation, *id.*; (3) although Tillett now asserts constitutional claims not raised in her Complaints, BLM has not waived its sovereign immunity for a claim

against it seeking money damages, *id. at 1-2*; (4) to the extent Tillett

asserts claims against the Interior Board of Land Appeals, such claims

would be barred by judicial immunity, *id. at 2*; (5) Tillett has not been

denied any constitutional rights and has been afforded due process

through these proceedings, *id.*; (6) Tillett's only avenue for review is

under the APA's limited waiver of sovereign immunity, but such APA

review does not allow for money damages or a court-ordered

investigation, *id.*; (7) BLM took the requisite "hard look" at the need for

a gather, did not misrepresent information concerning the 2015 gather,

did not tamper with evidence, and did not inappropriately fail to

consider the impacts of other grazing species upon the PMWHR, *id. at

3-10*; (8) BLM properly exercised its discretion in observing range usage

to protect both the PMWHR and the horses by conducting a gather to

move the herd population closer to the existing AML, *id. at 10-11*; (9)

BLM appropriately considered genetic diversity in both the Gather DR

and Fertility Control DR, even though the Wild Horses Act does not

require such consideration, *id. at 11-12*; and (10) BLM properly

considered and implemented the Fertility Control DR, *id. at 12-14*.

## IV. Legal Standards

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id*. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"In reviewing an administrative agency decision, summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal citation omitted).

**B.    The APA**

The Wild Horses Act does not provide a standard for judicial review.  Thus, the APA governs the Court's review of BLM's actions.  *In Defense of Animals*, 751 F.3d at 1061 (*citing Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858-59 (9th Cir. 2005)).  Under the APA, the Court "must set aside the BLM's actions, findings, or conclusions if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id.* (*quoting* 5 U.S.C. § 706(2)(A)).  Courts must engage in a "searching and careful" review, but "the arbitrary and capricious standard is narrow, and [a] court cannot substitute its own judgment for that of the agency."  *Id.* (*quoting Ocean Advocates*, 402 F.3d at 858 (citation omitted)).  "An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to

the evidence, or if its decision is either inherently implausible or contrary to governing law." *Id*. (*quoting The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)).

Review is highly deferential to the agency's expertise, and presumes the agency action to be valid. *Arkansas v. Oklahoma*, 503 U.S. 91, 112 (1992). The agency, however, must articulate a rational connection between the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Id*.; *see also Midwater Trawlers Co-op v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002).

## V. <u>Discussion</u>

### A. <u>Court Lacks Jurisdiction Respecting Tillett's Claims for Restitution and Investigation</u>

As an initial matter, the Court concludes that it lacks subject matter jurisdiction to entertain Tillett's claims for restitution or for the ordering of an investigation. Tillett has failed to provide any legal authority or jurisdictional basis for either remedy. The Court is mindful that Tillett relies on the First, Fifth, and Fourteenth Amendments to the U.S. Constitution in invoking this Court's subject matter jurisdiction, as well as a general allegation of "evasion of

review" of Constitutional issues that she claims amounts to a violation of her Fifth Amendment right to due process. *See ECF No. 37 at 1.* But her reliance is misplaced.

First, respecting Tillett's claims for restitution which, in the cases at hand, are in the nature of claims for money damages, "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *Jachetta v. United States*, 653 F.3d 898, 903 (9th Cir. 2011) (*quoting United States v. Mitchell*, 463 U.S. 206, 212 (1983)). Waiver of sovereign immunity cannot be implied, but "must be unequivocally expressed in statutory text." *Jachetta*, 653 F.3d at 903 (*quoting Lane v. Pena*, 518 U.S. 187, 192 (1996)). Absent waiver, sovereign immunity shields the United States and its agencies from suit. *Meyer*, 510 U.S. at 475.

The United States – in this case BLM – has not waived its sovereign immunity for actions seeking damages for constitutional violations. *See Holloman v. Watt*, 708 F.2d 1399, 1401-02 (9th Cir. 1983) (sovereign immunity not waived for claim under the Constitution for damages against the United States); *Arnsberg v. U.S.*, 757 F.2d 971,

980 (9th Cir. 1984) (same). As discussed below, the APA provides a limited waiver of BLM's sovereign immunity respecting some of Tillett's allegations. But the APA does not provide a waiver of sovereign immunity for money damages claims. *See Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir. 1998). Thus, sovereign immunity applies here. The Court lacks subject matter jurisdiction over Tillett's claim for restitution against BLM.

Second, respecting Tillett's claim for an investigation, the same conclusion is reached. BLM has not waived sovereign immunity for actions against it seeking an independent investigation as a remedy. BLM has sovereign immunity respecting this claim, and the Court lacks subject matter jurisdiction over it.

For the foregoing reasons, the Court will recommend that BLM's summary judgment motion be granted to the extent it relates to Tillett's claims for restitution and an investigation.

## B. The APA

Construing Tillett's pleadings and other submissions liberally, the Court concludes that her remaining claims and associated allegations mostly likely are intended to comprise a challenge to final agency

action under the APA.  As noted above, the APA governs the Court's review of BLM's actions, which the Court must not disturb unless it finds that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *In Defense of Animals*, 751 F.3d at 1061 (*quoting* 5 U.S.C. § 706(2)(A)).  For the reasons that follow, the Court concludes that BLM's actions are supported by the administrative record, and should not be disturbed.  Thus, the Court recommends that summary judgment be granted in BLM's favor.

The Wild Horses Act affords broad discretion to BLM to manage wild horses and ranges to maintain a healthy ecological balance between the horses, other species, and the range itself.  It provides, in relevant part, as follows:

> All wild free-roaming horses . . . are hereby declared to be under the jurisdiction of the Secretary for the purpose of management and protection in accordance with the provisions of this chapter.  The Secretary is authorized and directed to protect and manage wild free-roaming horses . . . as components of the public lands, and he may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation, where the Secretary after consultation with the wildlife agency of the State wherein any such range is proposed and with the Advisory Board established in section 1337 of this title deems such action desirable.  The Secretary shall manage wild free-roaming horses . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance

on the public lands. . . .  All management activities shall be
at the minimal feasible level and shall be carried out in
consultation with the wildlife agency of the State wherein
such lands are located in order to protect the natural
ecological balance of all wildlife species which inhabit such
lands, particularly endangered wildlife species.  Any
adjustments in forage allocations on any such lands shall
take into consideration the needs of other wildlife species
which inhabit such lands.

16 U.S.C. § 1333(a).

The Wild Horses Act also describes agency authority to determine

whether too many horses occupy a given area, and to take action as

necessary, as follows:

The Secretary shall maintain a current inventory of wild
free-roaming horses . . . on given areas of the public lands.
The purpose of such inventory shall be to:  make
determinations as to whether and where an overpopulation
exists and whether action should be taken to remove excess
animals; determine appropriate management levels of wild
free-roaming horses . . . on these areas of the public lands;
and determine whether appropriate management levels
should be achieved by the removal or destruction of excess
animals, or other options (such as sterilization, or natural
controls on population levels).

16 U.S.C. § 1333(b)(1).

The Wild Horses Act further provides that management of wild

horses is to be accomplished within the "multiple-use management

concept for the public lands[.]" See 16 U.S.C. § 1332©) (defining "range"

as "the amount of land necessary to sustain an existing herd or herds of

wild free-roaming horses . . ., which does not exceed their known territorial limits, and which is devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands[.]"); 16 U.S.C. § 1332(f) (defining "excess animals" as "wild free-roaming horses . . .  (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area.").

The federal regulations promulgated in relation to the Wild Horses Act also demonstrate the level of discretion that BLM enjoys in managing wild horses and the ranges they occupy.  They provide, in relevant part, that "[w]ild horses . . . shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat . . . [and] shall be considered comparably with other resource values in the formulation of land use plans."  43 C.F.R. §§ 4700.0-6(a) and (b).  And, the regulations further provide that BLM, through its authorized officer, is to prepare a herd management area plan and in it the authorized officer is to "consider the appropriate management level for the herd, the habitat

requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in [43 C.F.R.] § 4710.4." That section provides that wild horse management must "be undertaken with the objective of limiting the animals' distribution to herd areas[ ]" and must be at the "minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

As noted above, and relevant to the cases at hand, the Court has reviewed the administrative records. Having done so, it concludes that BLM properly applied the foregoing statutes and regulations in adopting the fertility control and gather decisions at issue to assist in implementing the 2009 HMAP and its AML of 90 to 120 horses (excluding the current year's foals). In doing so, the Court concludes that BLM's decisions were not arbitrary, capricious, an abuse of its discretion, or otherwise contrary to the law. And, the Court is not persuaded by Tillett's arguments, as discussed below.

Tillett first argues that BLM illegally darted nine mares over a span of years and failed to follow proper procedures and its own rules and regulations in doing so. *CV 15-48, ECF No. 2 at 1-2; ECF No. 37 at*

*2, 5.* She argues that this illegal darting was not a mistake as BLM claims, but rather was BLM's general policy. *ECF No. 37 at 2, 5.* And, she argues, the illegal darting violated her First Amendment rights and her Fifth Amendment right to due process. *Id.*

BLM does not dispute that some mares were given PZP doses that may not have met the fertility control protocol. *See BLM's Stmt. of Undisputed Facts (ECF No. 27) at ¶ 32.* But BLM notes, with record support, that Tillett did not raise this concern in her comments to the EA, so BLM did not address it in its responses to comments. *Id. at ¶ 31.* Also, BLM has presented evidence that approximately 277 doses of PZP were applied between 2011 and May 2015 under the 2011 fertility control decision. *Id.* Of those, 98 percent were applied correctly. *Id.* And of the mares who were darted not in conformity with the protocol, all have produced at least one foal. *Id. at ¶ 32.*

On this record, the Court concludes that Tillett's allegation that BLM "illegally darted" mares and has engaged in an "ongoing pattern of cover-ups" in implementing the Fertility Control DR is not supported. And, Tillett's First and Fifth Amendment rights were not violated. As noted, due process is not implicated because it is

undisputed that Tillett did not raise these concerns in her comments to the EA. In each instance in which a mare was darted when it should not have been, BLM took corrective action and documented the mistakes. This action, coupled with the 98 percent correctness rate in adhering to darting protocols over approximately four years, and the result that all misdarted mares produced foals, demonstrates that BLM's actions were not arbitrary, capricious, or an abuse of discretion.

Second, as detailed above, Tillett generally argues that BLM's actions respecting the PMWHR were arbitrary and capricious because BLM committed perjury, engaged in malfeasance and corruption, and engaged in "felonious behavior patterns[.]" *ECF No. 37 at 3*. Tillett's arguments are vague, speculative, and non-specific. Thus, the Court finds them unpersuasive.

Third, Tillett argues that BLM has not complied with the Wild Horses Act for decades. *Id. at 3-4*. Quoting from the Wild Horses Act language, she argues that BLM is supposed: (1) to provide wild horses with a sanctuary; (2) to protect the horses; and (3) to carry out all management activities at the "minimal feasible level." *Id*.

The Ninth Circuit, in *In Defense of Animals*, *supra*, addressed a

similar argument when plaintiffs in that case argued that BLM failed to manage horses and burros at a "minimal feasible level" when it conducted a helicopter gather and capture and injected mares with immunocontraceptives. 751 F.3d at 1066. The court acknowledged that the Wild Horses Act does provide that "[a]ll management activities shall be at the minimal feasible level." But the court rejected plaintiffs' argument noting "[p]laintiffs do not adequately take into account the full statutory language, which provides that '[a]ll management activities shall be at the minimal feasible level and shall be carried out . . . *in order to protect the natural ecological balance of all wildlife species which inhabit such lands. . . .*'" *Id.* (*quoting* 16 U.S.C. § 1333(a)) (emphasis in original). The Ninth Circuit further stated:

> Given BLM's determination that the overpopulation of wild horses and burros threatened the natural ecological balance on the HMA [herd management area], it reasonably determined that the gather was necessary to restore the AMLs and thereby protect the HMA's natural ecological balance.
>
> Moreover, the BLM had simultaneous duties not only "to achieve and maintain a thriving natural ecological balance" on the HMA, § 1333(a), but also to remove excess animals "immediately" when the BLM determined "that an overpopulation exist[ed]." § 1333(b)(2). Congress could not have intended that the "minimal" management requirement would force the BLM to ignore these other statutory mandates. Given that this court must defer to the BLM's

> expertise under the APA, *see Salmon River Concerned*
> *Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994), we
> hold that the BLM reasonably interpreted its statutory
> directive that management be at a "minimal feasible level"
> when it decided to implement the Gather Plan in light of the
> overpopulation at the time of the gather and the fact that
> inaction would have led only to further detrimental
> population increases.

*Id.* Precisely the same conclusion is appropriate in the cases at hand.

Tillett's reliance on only select language from the Wild Horses Act fails

to capture the more comprehensive nature of the BLM's responsibility

for management on the PMWHR. Consequently, her argument is not

persuasive.

Fourth, Tillett argues that the BLM failed to properly consider

genetic diversity in both the Gather DR and Fertility Control DR. *ECF*

*No. 37 at 4.* And, she argues, there is reason to dispute the data upon

which BLM relied for the 2015 Gather. *Id. at 5-6.* The Court is not

persuaded.

The 2015 Gather EA expressly provides:

BLM's Most Recent Genetic Analysis Conducted by Dr. Gus
Cothran

This analysis is based upon samples provided from removed
horses in the summer of 2012. Dr. Cothran processes these
samples for the BLM and it is BLM data and information.
The horses removed during the 2012 gather were

individuals from highly represented and interrelated bloodlines. Removal was based upon kinship or "bloodlines" as identified in the HMAP. Seven mare/foal pairs were sampled along with numerous siblings and half siblings. Only one mare and her foal from a rare line were removed in 2012 and that was due to health concerns. Although Dr. Cothran's report is very factual on the genetic analysis and BLM does not dispute Dr. Cothrans [sic] expertise as an equine geneticist the interpretation is lacking information about the herd demographics and kinship. The organization with the kinship expertise and information is the Pryor Mountain Wild Mustang Center which provided much advice on lineage. In contrast, the BLM believes the results let us know we did in fact remove the correct horses in 2012.

*GAR 22.*

This excerpt from the 2015 Gather EA shows that BLM did consider Dr. Cothran's report. As noted, although BLM found the report factual respecting the genetic analysis, it concluded that the report was not based on a sampling representing correct herd demographics and kinship. As mentioned above, the Court must afford the BLM's expertise deference under the APA. See *Salmon River Concerned Citizens,* 32 F.3d at 1356. In doing so, the Court cannot conclude on this record that BLM's consideration of Dr. Cothran's report was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

And, to the extent Tillett questions the fertility control data upon

which BLM relied based on comments made by Ms. Devlin (*ECF No. 37 at 5-6*), the Court is not persuaded. The record reflects that the fertility control administered on the PMWHR is no longer experimental and has been approved by the Environmental Protection Agency as ZonaStat-H. *See FAR 24.* Also, the record indicates that the Humane Society of the United States supports use of fertility control on the PMWHR under the 2015 Fertility Control DR. *FAR 180-83.* Finally, BLM considered several different studies in concluding that fertility control was an acceptable population-control method and Tillett has provided no competent evidence to the contrary. *See, e.g., FAR 5* (noting that the 2009 HMAP's AML of 90-120 horses was based, in part, on the condition of the PMWHR as found in a 2004 survey and assessment of the PMWHR conducted by the Natural Resources Conservation Service ("NRCS"). This NRCS survey and the use of fertility control was the subject of prior litigation in a case in which this Court granted judgment in favor of BLM's decision to utilize fertility control. *See Cloud Foundation, Inc. v. Kempthorne*, CV 06-111-BLG-RFC-CSO (*ECF Nos. 129, 131, and 133*)).

Fifth, Tillett argues that the PMWHR is in good condition based

on her own observations over many years and that there is "nothing wrong with [it] & never was." *ECF No. 37 at 4-5*. The Court cannot conclude, however, that Tillett's observations, even for a long period of time, somehow render incorrect BLM's conclusions respecting the condition of the PMWHR. Tillett has not pointed to any record evidence supporting her position. On the other hand, the 2009 HMAP identified forage species and the utilization rate after monitoring and range studies. *FAR 684-88*. The monitoring has continued, and BLM's data shows that damage to the PMWHR was occurring with a population of 170 adult horses. *GAR 17*. Affording BLM discretion to rely on its own experts and data, the Court cannot conclude that BLM acted improperly in not accepting Tillett's observation that there is nothing wrong with the PMWHR.

Finally, as noted, Tillett argues that she is modifying her request for restitution by adding to the amount she originally claimed in her Complaints and adding some conditions. *ECF No. 38 at 8-9*. The Court concludes that she should not be permitted to do so for two reasons. First, the Court already has discussed above that it is without jurisdiction over her claim for restitution.

Second, Tillett cannot amend her Complaints in either a summary judgment motion or in a response to such a motion. As this Court recently observed in *Elk Petroleum, Inc. v. Rocky Mountain Regional Director*, 2016 WL 676362, *5 (D. Mont., Feb. 18, 2016):

> When a "complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008). A party may not effectively amend a complaint by raising a new theory in a summary judgment motion. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010). "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Products, Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006); *see also Novoa v. City & Cty. of San Francisco*, 2015 WL 5169123, at *6 (N.D. Cal. Sept. 3, 2015) ("Plaintiff failed to include any factual allegations related to Defendant's violation of his due process right and did not identify it as a cause of action in the complaint. Plaintiff also did not seek leave to amend his complaint to include such allegations. For that reason alone, Defendants are entitled to summary judgment on Plaintiff's due process claim").

Here, Tillett cannot amend her Complaints simply by stating in her response to BLM's summary judgment motion that she is doing so.

## VI. <u>Conclusion</u>

Based on the foregoing, **IT IS RECOMMENDED** that BLM's combined motion for summary judgment on consolidated cases (*ECF*

*No. 25*) be **GRANTED**.

  **NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court, and copies served on opposing counsel, within fourteen (14) days after entry hereof, or objection is waived.

  DATED this 4th day of April, 2016.

/s/ Carolyn S. Ostby
United States Magistrate Judge
